[No. E050459. Fourth Dist., Div. Two. Jan. 27, 2011.]

In re JESSE ESPINOZA on Habeas Corpus.

COUNSEL

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill and Gregory J. Marcot, Deputy Attorneys General, for Appellant The People.

Richard Schwartzberg, under appointment by the Court of Appeal, for Respondent Jesse Espinoza.

OPINION

**HOLLENHORST, Acting P. J.**—Jesse Espinoza (Defendant), an inmate in state prison, petitioned the trial court for a writ of habeas corpus, seeking reversal of a decision of California's Department of Corrections and Rehabilitation (CDCR) denying family visitation privileges on the grounds that Defendant had been found guilty of narcotics distribution while incarcerated in state prison. The trial court granted the petition and ordered CDCR to reconsider Defendant's request based only upon consideration of his conduct during his current term of incarceration and without consideration of his past prison disciplinary violations for institutional narcotics trafficking. CDCR appeals, contending (1) Defendant's challenge to CDCR's decision is untimely, and (2) the trial court erred in interpreting California Code of Regulations, title 15, section 3177.[1] We reverse.

I. PROCEDURAL BACKGROUND AND FACTS

In both 1980 and 1987, Defendant was incarcerated in state prison and was found guilty, in separate institutional administrative disciplinary actions, of

---

[1] All further undesignated section references are to title 15 of the California Code of Regulations.

the charge of attempting to introduce contraband into his institution. Subsequently, he completed his sentence and was released from prison.

On June 19, 2003, Defendant was convicted of voluntary manslaughter and was sentenced to 11 years in state prison. After beginning his term, he requested permission for an extended overnight visit with his wife at the institution, which CDCR denied pursuant to section 3177 of the regulations. Defendant filed an administrative appeal of the decision, which was denied at the highest administrative level of CDCR on February 9, 2005.

On August 26, 2007, two and one-half years later, Defendant filed a petition for writ of habeas corpus (Petition) in the Riverside County Superior Court challenging CDCR's decision. On January 28, 2010, the trial court issued a summary order granting the Petition. CDCR was now required to allow Defendant to have family visitation privileges. CDCR filed a motion for reconsideration. On February 22, 2010, the court issued an order denying the motion for reconsideration because it had considered CDCR's points and authorities. However, the court clarified the basis of its prior order and modified the remedy from requiring CDCR to allow family visitation privileges to requiring CDCR to reconsider Defendant's request based on the record of his current incarceration term without regard to his disciplinary actions in the 1980's for institutional narcotics trafficking. On March 16, 2010, CDCR filed a notice of appeal.

## II. DEFENDANT'S CLAIM IS TIMELY

Relying on the cases of *In re Sanders* (1999) 21 Cal.4th 697, 703, 705 [87 Cal.Rptr.2d 899, 981 P.2d 1038] (10-year delay in filing collateral challenge to final criminal judgment and sentence of death), *In re Robbins* (1998) 18 Cal.4th 770, 779–780 [77 Cal.Rptr.2d 153, 959 P.2d 311] (seven-year delay in filing collateral challenge to final criminal judgment and sentence of death), and *In re Clark* (1993) 5 Cal.4th 750, 759, 760, 761 [21 Cal.Rptr.2d 509, 855 P.2d 729] (several-year delay and second collateral challenge to final criminal judgment and sentence of death), CDCR argues Defendant's Petition is untimely. It is undisputed that Defendant waited more than two years to file the Petition, but as we explain, the family visitation issue is properly before us.

■ "The writ of habeas corpus enjoys an extremely important place in the history of this state and this nation. Often termed the 'Great Writ,' it 'has been justifiably lauded as " 'the safe-guard and the palladium of our liberties' " ' [citation] and was considered by the founders of this country as the

'highest safeguard of liberty' [citation]. As befits its elevated position in the universe of American law, the availability of the writ of habeas corpus to inquire into an allegedly improper detention is granted express protection in both the United States and California Constitutions. [Citations.] In this state, availability of the writ of habeas corpus is implemented by Penal Code section 1473, subdivision (a), which provides: 'Every person unlawfully *imprisoned* or *restrained* of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment or restraint.' (Italics added.)" (*People v. Villa* (2009) 45 Cal.4th 1063, 1068 [90 Cal.Rptr.3d 344, 202 P.3d 427].)

Notwithstanding the above, litigants mounting collateral challenges to final criminal judgments must do so in a timely fashion. (*In re Robbins, supra*, 18 Cal.4th at p. 778.) "[T]o avoid the bar of untimeliness with respect to [petitions filed after close of briefing on direct appeal], the *petitioner* has the burden of establishing (i) absence of substantial delay, (ii) good cause for the delay, or (iii) that the claim falls within an exception to the bar of untimeliness. [¶] Substantial delay is measured from the time the petitioner or his or her counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim. . . . [¶] . . . [¶] A claim that is substantially delayed without good cause, and hence is untimely, nevertheless will be entertained on the merits if the petitioner demonstrates . . . that the petitioner was convicted . . . under an invalid statute." (*Id.* at pp. 780–781.)

Because CDCR bases its untimeliness argument on the claim that Defendant waited more than two years to file the Petition, we reject it out of hand. To begin with, we note all of the cases CDCR relies upon are capital cases where the petitions were filed to challenge the final judgment or sentence of death. Here, the issue on habeas corpus is not Defendant's guilt, innocence, or the appropriate punishment, but whether CDCR and the trial court properly interpreted section 3177 of the regulations, an issue we review de novo. (*In re Johnson* (1998) 18 Cal.4th 447, 461 [75 Cal.Rptr.2d 878, 957 P.2d 299]; *In re Collins* (2001) 86 Cal.App.4th 1176, 1181 [104 Cal.Rptr.2d 108] ["basic principles of appellate review apply to an appeal from an order granting a petition for habeas corpus . . ."].) More importantly, because our review is confined to interpreting section 3177, this is not a case where Defendant's delay will prejudice CDCR or the People by unjustifiably delaying implementation of the law or setting aside the final judgment of conviction when retrial would be difficult or impossible. (*In re Clark, supra*, 5 Cal.4th at p. 764.)

Rather, as Defendant points out, if there is any prejudice, it has been to him, because his delay has "prevented [him] from having family visits during the majority of his present incarceration. And given the likely mootness of the underlying, substantive issue . . . the merits should be reached to insure that other inmates similarly situated obtain the benefit of the underlying litigation." We agree. The procedural bar of timeliness is subject to exceptions. We find that this is one. Accordingly, we relieve Defendant from any claim of untimeliness and reach the merits of his issue.

## III.   INTERPRETATION OF SECTION 3177

CDCR contends the trial court erred in its interpretation of section 3177 of the regulations. Defendant disagrees. Rather, he argues that section 3177 "is circumscribed by either the twelve month limitations period contained in [Regulations, section] 3375.3, subdivision (b)(1) or by the Due Process Clauses of the federal and California [C]onstitutions . . . ." We agree with CDCR.

### A.   *Standard of Review*

■   "We construe statutes and regulations in a manner that carries out the legislative or regulatory intent. [Citation.] We must ' "ascertain the intent of the [drafters] so as to effectuate the purpose" ' of the regulations. [Citation.] The words used are the primary source for identifying the drafter's intent. [Citation.] We give those words their usual and ordinary meaning where possible. [Citations.] We give significance to every word, avoiding an interpretation that renders any word surplusage. [Citation.] We also interpret words of a regulation in context, harmonizing to the extent possible all provisions relating to the same subject matter. [Citation.]" (*Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1505–1506 [1 Cal.Rptr.3d 207].)

### B.   *Analysis*

■   Section 3177 of the regulations governs family visitation. Family visitation is a privilege. (§ 3177, subd. (b).) "Family visits are extended overnight visits, provided for eligible inmates and their immediate family members as defined in Section 3000, commensurate with institution security, space availability, and pursuant to these regulations." (§ 3177.) In relevant part, section 3177 provides: "Institution heads shall maintain family visiting policies and procedures. . . . [¶] . . . [¶] (b) Family visiting is a privilege. . . . [¶] . . . [¶] (2) *Family visits shall not be permitted for inmates who are* in any of the following categories: . . . guilty of one or more Division A or Division B offense(s) within the last 12 months; or *guilty of narcotics distribution while incarcerated in a state prison.*" (§ 3177, italics added.) As CDCR

points out, the intent of the family visitation regulations is to establish an accommodating process for family visitation "subject to the need to maintain order, the safety of persons, the security of the institution/facility, and required prison activities and operations." (§ 3170, subd. (a) [general visitation]; see § 3177, subd. (b)(1)(B).)

Here, because Defendant was found guilty in 1980 and 1987 of narcotics distribution while incarcerated in state prison, his request for family visitation in 2004 was denied because he fell into the category of inmates described in section 3177, subdivision (b)(2) of the regulations. The only issues before this court are whether section 3177 "is to be read to apply to the entire span of an inmate's present or prior incarcerations and . . . if . . . [it] . . . is to be read so broadly, [does] such a reading violate[] an inmate's federal and California right to substantive Due process of Law."

### 1. *Language in section 3177 of the regulations*

■ To begin with, section 3177 of the regulations neither expressly nor impliedly identifies a time limitation for the relevance of prior disciplinary actions. Rather, the language is simple; the privilege of overnight visitation must be denied if the inmate was found "*guilty of narcotics distribution while incarcerated in a state prison.*" (§ 3177, subd. (b)(2), italics added.) If a time limitation was intended, CDCR could easily have qualified the language by adding "within the last 12 months" or "during the inmate's current term of imprisonment." For example, section 3177 also provides that the privilege of overnight visitation must be denied if the inmate was found "guilty of one or more Division A or Division B offense(s) within the last 12 months . . . ." (§ 3177, subd. (b)(2).) The fact that the words "within the last 12 months" were added to certain violations but not others speaks volumes. (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 73 [109 Cal.Rptr.2d 1, 26 P.3d 332] [when one part of a statute contains a term or provision, the omission of that term or provision from another part of the same statute indicates that the Legislature intended to convey a different meaning].)

■ Despite the omission of the words "within the last 12 months," Defendant contends we should look to section 3375.3 of the regulations, which sets forth a 12-month period as the time limitation for the relevance of prior disciplinary actions. Section 3375.3 governs the "factors and related numerical weights used to determine an inmate's preliminary score" for purposes of his or her classification in prison. (§ 3375.3.) Although section 3375.3, subdivision (b) provides for a 12-month period regarding "[p]rior incarceration behavior," we note that subdivision (b)(4) discusses "Unfavorable prior behavior." Specifically, it provides: "A single serious disciplinary may result in the assessment of points on the classification score sheet for

more than one factor listed in subsections 3375.3(b)(4)(C) through (H). *Assess points for behavior for which the inmate was found guilty and for behavior that occurred during any prior incarceration, if the behavior meets the definitions below even if it occurred beyond the last 12 months of incarceration.*" (§ 3375.5, subd. (b)(4)(B), italics added.) Section 3375.3, subdivision (b)(4)(E), in relevant part, provides: "For each involvement in the distribution of any controlled substance, per subsection 3323(c)(7), into a jail or correctional facility for distribution and sales, four points shall be entered in Boxes 57–58." The clear language of section 3375.3 allowed for CDCR to consider Defendant's prior violations of drug trafficking "during any prior incarceration . . . even if [they] occurred beyond the last 12 months of incarceration." (§ 3375.3, subd. (b)(4)(B).) This explains why the language in section 3177 omits the 12-month relevancy period for prior drug trafficking offenses. (§ 3177, subd. (b)(2).)

Likewise, we reject Defendant's assertion that this case is analogous to the decision in *In re French* (1980) 106 Cal.App.3d 74 [164 Cal.Rptr. 800]. In that case, the appellate court held that the indefinite suspension of the right of certain women to visitation as punishment for their refusal to submit to fully unclothed body searches violated Penal Code section 2601, former subdivision (d), which guaranteed prisoners the right to have personal visits. (*In re French, supra*, 106 Cal.App.3d at p. 76.) In *French*, the CDCR was excluding inmate visitors based upon past (not present) refusals to submit to strip searches where the visitors were suspected of smuggling. (*Id.* at pp. 77–78.) Unlike the facts in *French*, here the past behavior is Defendant's (the inmate's) violations of drug trafficking in state prison. Further, the language in section 3177 of the regulations mandates the denial of family visitation to those inmates found "*guilty of narcotics distribution while incarcerated in a state prison.*" (§ 3177, subd. (b)(2), italics added.)

### 2. *Due process*

Because there is no statutory limitation in considering Defendant's prior violations of drug trafficking, Defendant contends that section 3177 of the regulations violates his right to substantive due process of law. We disagree.

■ "A prisoner has numerous constitutional rights related to the conditions of his confinement or the lawful execution of his sentence which are independent of the criminal prosecution that led to his status as prisoner. Among these are his state and federal constitutional rights against cruel and/or unusual punishment [citations], and his rights to religious freedom, access to the courts, and freedom from invidious discrimination based on race. [Citation.] These fundamental constitutional rights reflect strong public

policies, any institutional violation of which of necessity affects a large number of persons, most of whom are ill equipped by education, training, or financial ability to initiate and adequately prosecute legal actions to vindicate those rights without the assistance of counsel. [¶] Prisoners in California are granted additional rights by statute and regulation, some of which implement the constitutional guarantees, while others create new rights, and prisoners have a due process right to the enforcement of these statutes and regulations. [Citations.]" (*In re Head* (1986) 42 Cal.3d 223, 229 [228 Cal.Rptr. 184, 721 P.2d 65], fn. omitted.)

■ Here, as CDCR points out, inmates have no constitutional right while incarcerated to contact or conjugal visits. (*Kentucky Dept. of Corrections v. Thompson* (1989) 490 U.S. 454, 460 [104 L.Ed.2d 506, 109 S.Ct. 1904] [no due process right to unfettered visitation]; *Barnett v. Centoni* (9th Cir. 1994) 31 F.3d 813, 817 [prisoners have no constitutional right to contact visitation]; *Gerber v. Hickman* (9th Cir. 2002) 291 F.3d 617, 621–622 ["The fact that California prison officials may choose to permit some inmates the *privilege* of conjugal visits is simply irrelevant to whether there is a constitutional *right* to conjugal visits or a right to procreate while in prison."]; *Toussaint v. McCarthy* (9th Cir. 1986) 801 F.2d 1080, 1113–1114 [denial of contact visits does not violate 8th Amend.].) Although this should end the discussion, we note that section 3177 of the regulations grants to inmates the privilege of family visitation. (§ 3177, subd. (b).) This privilege is conditioned on whether an inmate was found "guilty of narcotics distribution while incarcerated in a state prison." (§ 3177, subd. (b)(2).) Thus, Defendant questions whether section 3177 will withstand constitutional scrutiny.

■ "We review de novo 'a constitutional challenge to the facial validity of a prison policy.' [Citation.] In order to withstand a constitutional challenge, including a First Amendment challenge, a prison regulation must be 'reasonably related to legitimate penological interests.' [Citation.] The United States Supreme Court developed this standard by acknowledging 'two basic and potentially competing principles.' [Citation.] First, 'prison walls do not form a barrier separating prison inmates from the protections of the Constitution.' [Citation.] Second, ' "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." ' [Citation.]

"The Court developed a four-pronged test (the *Turner* test[2]) to determine whether a prison regulation or policy is reasonably related to legitimate penological interests: '(1) whether there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether the

---

[2] *Turner v. Safley* (1987) 482 U.S. 78 [96 L.Ed.2d 64, 107 S.Ct. 2254] (*Turner*).

impact of accommodating the asserted constitutional right will have a significant negative impact on prison guards, other inmates and the allocation of prison resources generally; and (4) whether the policy is an "exaggerated response" to the [prison's] concerns.' [Citation.]" (*Snow v. Woodford* (2005) 128 Cal.App.4th 383, 390 [26 Cal.Rptr.3d 862], fn. omitted.)

Here, Defendant concedes the first prong of the *Turner* test but generally alleges the remaining three prongs are not satisfied. Specifically, Defendant states that "while there is a governmental interest at stake (security) . . . , there are no alternative means of exercising the right of 'family visitation,' there is no practical effect on prison employees or resources to simply require greater screening of family members when 'family visitation' is conducted (i.e., strip searches, cavity searches) and a policy of restricting 'family visitation' based upon two incidents of trafficking narcotics in a state prison institution dating from December 11, 1980 and August 2, 1987 constitutes an 'exaggerated response' to the [prison's] concerns' " CDCR correctly points out that the inmate challenging the regulation bears the burden of proof. (*Turner, supra,* 482 U.S. at pp. 90–91.) Thus, we consider whether Defendant has met his burden.

■ To begin with, we do not agree that section 3177 of the regulations, which discusses the privilege of family visitation, has created a constitutionally protected right. Nonetheless, even if we were to assume such is the case, we agree with CDCR's analysis. Defendant has conceded the first prong of the *Turner* test. As for the second, CDCR notes Defendant is not being denied contact visits with his spouse or other family members in the prison's visiting room. He simply faces a restriction on the manner in which he may visit his spouse. Thus, there is an alternative avenue open for Defendant to maintain his family relationship with his spouse. As for the third prong, given the serious security dangers associated with smuggling drugs into the state prison (*Bell v. Wolfish* (1979) 441 U.S. 520, 559 [60 L.Ed.2d 447, 99 S.Ct. 1861]), prohibiting inmates (who have been found guilty of trafficking drugs in the prison) from overnight visits will decrease the opportunity for them to smuggle the drugs into prison and serve as a deterrent to other inmates who are contemplating doing so. Without such a deterrent, there will be a negative impact on a prison's efforts to combat the serious problem of drugs in the prison. Finally, denial of family visitation between an inmate and his or her spouse does not amount to an exaggerated response to the drug trafficking problem in the prison.

Given the above, section 3177 of the regulations does not violate Defendant's constitutional right to due process of law because it meets the four-pronged *Turner* test.

## IV.  DISPOSITION

The order of the trial court is reversed, and the matter is remanded to the trial court with directions to deny the petition for relief.

McKinster, J., and King, J., concurred.