Filed 3/25/16; pub. order 4/22/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JORGE A. GOMEZ,<br><br>on Habeas Corpus. | No. A142470<br><br>(Del Norte County Super. Ct.<br> No. 145020) |

We determine herein whether "some evidence" supports the disciplinary ruling by Pelican Bay State Prison (PBSP) authorities that inmate Jorge A. Gomez engaged in "behavior which might lead to violence or disorder, or otherwise endangers facility, outside community or another person" in violation of section 3005(a) of title 15 of the California Code of Regulations.[1]

Gomez was found to have refused nine consecutive meals over a three-day period coincident with a larger hunger strike and work stoppage by state prison inmates protesting our state prisons' solitary confinement practices. The PBSP authorities ruled that Gomez, by his refusal, had violated section 3005(a) and assessed him 90 days of conduct credits. In his petition for a writ of habeas corpus, Gomez contends, among other things, that there is not sufficient evidence to support this disciplinary ruling. We agree. We grant his petition on this ground and order that this PBSP disciplinary ruling be reversed, Gomez's 90 days of conduct credits be restored and all references to his disciplinary charge be expunged from his central file.

---

[1] All further code references are to title 15 of the California Code of Regulations, unless otherwise specified.

1

## BACKGROUND

Gomez was placed in PBSP in 2000 as a violent felon. In 2003, he was relocated to PBSP's Security Housing Unit (SHU). He resided there in solitary confinement for more than a decade,[2] one of many California prisoners who have been housed in solitary confinement, including indefinitely, based on findings of gang affiliation.

## I.

### *The Initial Rules Violation Report*

PBSP authorities disciplined Gomez for refusing nine consecutive meals during three days, from July 8, 2013, to July 10, 2013, coincident to a hunger strike and work stoppage by California state prison inmates who were protesting our state prisons' solitary confinement practices.[3] This disciplinary process began on July 16, 2013, when Sergeant R. Navarro prepared a "Rules Violation Report," also known as a "CDC 115," charging Gomez with violating section 3005(d)(3), which states: "Inmates shall not participate in a riot, rout, or unlawful assembly." The next day, Gomez's refusal was classified as a "serious" rules violation, a Division "D" offense.

---

[2] Gomez states that he was relocated to High Desert State Prison in May 2015.

[3] Such practices have come under increasing scrutiny by legal scholars in recent years. (See, e.g., Bennion, *Banning the Bing: Why Extreme Solitary Confinement Is Cruel and Far Too Usual Punishment* (2015) 90 Ind. L.J. 741; Shaiq, *More Restrictive Than Necessary: A Policy Review of Secure Housing Units* (2013) 10 Hastings Race & Poverty L.J. 327.) United States Supreme Court Justice Anthony Kennedy wrote last year: "Of course, prison officials must have discretion to decide that in some instances temporary, solitary confinement is a useful or necessary means to impose discipline and to protect prison employees and other inmates. But research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price. See, *e.g.,* Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U. J. L. & Pol'y 325 (2006) (common side-effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors). . . . [¶] Over 150 years ago, Dostoyevsky wrote, 'The degree of civilization in a society can be judged by entering its prisons.' The Yale Book of Quotations 210 (F. Shapiro ed. 2006). There is truth to this in our own time." (*Davis v. Ayala* (2015) __U.S.__ [135 S.Ct. 2187, 2210] (conc. opn. of Kennedy, J.).)

In his CDC 115, Sergeant Navarro reported that Gomez's refusal amounted to "Willfully Delaying Peace Officer (Participation in a Mass Hunger Strike)." Sergeant Navarro further reported that he discovered Gomez's violation on July 10, 2013, when he reviewed Gomez's CDC 114-A Detention/Segregation Record (CDC 114-A) and found that Gomez had missed nine consecutive meals as of that date. Sergeant Navarro continued: "Pursuant to Operational Procedure (OP) 228 an inmate that misses nine (9) consecutive state issued meals is considered to be on a hunger strike. This refusal coincided with a planned, statewide hunger strike/work stoppage/mass disturbance organized by the inmates housed in the SHU at PBSP. GOMEZ's willful and deliberate behavior has caused delays in the custody operations and additional workload for custody and medical staff by the increase in escorts and the monitoring of inmates suspected of participating in this hunger strike. With these additional requirements, staff members have been delayed in the performance of their normal duties. Furthermore, GOMEZ's actions by willfully participating in the hunger strike, have contributed to significant disruptions of the normal operation of this Institution. The disruptions are noted by having delayed or canceled inmate services, such as the Law Library, canteen, medical appointments and yard. GOMEZ's refusal to use the appropriate venues to voice his grievance has resulted in a decrease in services for him and the inmates who have not participated in this hunger strike/work stoppage/mass disturbance."

The record indicates that Sergeant Navarro attached to his CDC 115 a "CDC 114-A" for Gomez for the period from July 8, 2013, through July 14, 2013. Exhibit G to Gomez's petition appears to be this CDC 114-A (although Gomez referred to it as a "List of Staff Witnesses (Names)"). It is a one-page "inmate segregation record" of daily activity for Gomez. It indicates that Gomez refused breakfast, lunch and dinner on July 8, July 9 and July 10, as well as on July 11, resumed completing all of his meals on July 12, and completed all of them on July 13 and July 14.[4]

---

[4] Although Exhibit G indicates that Gomez also refused his three meals on July 11, Sergeant Navarro's CDC 115 and the subsequent disciplinary ruling indicate Gomez was disciplined for his refusal of nine consecutive meals from July 8 to July 10.

## II.

### *Gomez's Request for an Investigative Employee*

A week after Sergeant Navarro prepared the CDC 115, on July 23, 2013, Gomez requested the assignment of an investigative employee to "separately investigate the officials in C3, to see if inmate committed any crime."[5]  His request was denied that same day pursuant to section 3315(d)(1) of title 15 of the California Code of Regulations without further explanation.[6]

## III.

### *The Disciplinary Hearing*

Four days later, on July 27, 2013, Gomez appeared at a disciplinary hearing regarding Sergeant Navarro's CDC 115 that was conducted by a senior hearing officer, Correctional Lieutenant D. James.  This senior hearing officer prepared a written summary of the hearing.

The summary states that Gomez acknowledged receipt of a copy of the CDC 115, supplemental pages and the CDC 114-A before the hearing.  The summary continues, "These documents as well as the disciplinary charge of WILLFULLY DELAYING A PEACE OFFICER (PARTICIPATION IN A MASS HUNGER STRIKE), was [*sic*] reviewed with GOMEZ in the hearing.  He stated that he understood and that he was prepared to begin the hearing."  It further states that "[t]he disciplinary was served on the inmate within 15 days of discovery and the hearing was held within 30 days of service.  The inmate received his copies of all documents in advance of this hearing.  There are no

---

Therefore, we refer herein to Gomez's refusal of nine consecutive meals.  Our views would not change, however, if the disciplinary ruling was based on Gomez's refusal of twelve consecutive meals from July 8 to July 11.

[5]  Both the "requested" and "waived" boxes on the form are marked on this CDC 115-A form, but respondent acknowledges that Gomez requested an investigative employee.

[6]  Section 3315(d)(1), entitled "Investigative Employee," contains subsections (A) through (E), which state various details about the appointment and waiver of an investigative employee.

due process issues." The hearing summary states Gomez was able to communicate effectively with the senior hearing officer, demonstrated that he could read and understand the CDC 115, waived presenting witnesses and did not present any testimony himself in his own defense. Also, the summary states that the senior hearing officer requested no witnesses, that there was no testimony presented and, in a section entitled "Video and Photo Evidence," that "[o]nly a photocopy of the CDC 114-A . . . was used as evidence" in the hearing.

The hearing summary contains a confusing articulation of the senior hearing officer's finding that Gomez committed a serious rules violation. It states in a section entitled "Plea": "Guilty," with no further explanation. However, in a section entitled "Finding," the summary states, "*Not Guilty* of the California Code of Regulations (CCR), Title 15, §3005(d)"—the only regulation Sergeant Navarro cited in the CDC 115 given to Gomez before the hearing. (Italics added.) The hearing summary then states: "*Guilty of the equally included offense, CCR §3005(a)*, CONDUCT: Inmates and parolees shall obey all laws, regulations, and local procedures, and refrain from behavior that might lead to violence or disorder, or otherwise endangers the facility, outside community or other person; specific act Delaying a P/O Participation in a Mass Hunger Strike, (Division 'D' offense)." (Italics added.)

The hearing summary states that three items provided evidentiary support for this guilty finding. The first was Sergeant Navarro's "testimony." This can only be a reference to Sergeant Navarro's written statements in the CDC 115, however, since the hearing summary indicates no one testified at the hearing. The hearing summary then states that Sergeant Navarro "conducted a review of GOMEZ'S CDC 114-A Segregation Record and documented that GOMEZ had refused nine consecutive meals, and that GOMEZ'S refusal constituted a hunger strike which coincided with a planned statewide hunger/strike/work stoppage which is a mass disturbance by inmates housed in the [PBSP SHU]. Sergeant Navarro goes on to say that GOMEZ'S refusal to accept these meals was a deliberate and willful act that resulted in delays in Custody operations and created

5

additional workloads for Custody and Healthcare staff through the increased escorts and monitoring of inmates suspected of participating."

The second item was the CDC 114-A. The senior hearing officer wrote that it "reflects as of 07/10/13, GOMEZ refused nine consecutive meals. This document shows that these meals were offered to GOMEZ by different staff and staff's documentation of GOMEZ's refusal to accept these meals."

The third item was "[t]he defendants' [*sic*] plea of guilty."

The senior hearing officer assessed Gomez 90 days of credits for a "Division D" offense. He informed Gomez that these credits could be restored upon Gomez's request after a period of time had passed, but that Gomez would forfeit restoration if he were "found guilty of any administrative or serious CDC-115."

## IV.

### *Gomez's Administrative Appeals*

Gomez appealed the senior hearing officer's ruling. He argued the prison had violated his constitutional right to freedom of speech by punishing him for "hunger striking in a peaceful manner." He also argued that his due process rights were violated based on his own rendition of what occurred at the disciplinary hearing. Gomez contended that he did not plead guilty, that "if anything I was guilty of not eating and nothing else," and that he did not waive his request for an investigative employee.

PBSP Warden Barnes denied Gomez's appeal in a written decision that cites large portions of the senior hearing officer's findings. Warden Barnes found that "[t]he [CDC 115] was a direct result of the inmate's refusal to accept nine-consecutive [*sic*] state issued meals, which indicated the inmate was participating in a mass statewide hunger strike. As a result of the inmate's willful and deliberate participation in this organized mass disturbance, significant delays occurred in the daily operation of the institution. Further, this action created an additional workload for custody and medical staff, as the participating inmates were required to be escorted and/or monitored daily, until they accepted a state issued meal." Also, the senior hearing officer had "established in the hearing all due process had been met." Barnes concluded that the senior hearing officer's

6

"finding was reasonable and the inmate has failed to present sufficient evidence to warrant a dismissal of the [CDC 115]."

Gomez appealed again, based on his contention that his hunger strike was a peaceful exercise of his freedom of speech. He insisted that he did not plead guilty and that he was "guilty of not eating and nothing else." He stated that he had wanted an investigative employee in order to "ask questions to the C.O.s and see if they can say anything about me (inmate) delaying and doing anything else besides not eating," but that the senior hearing officer denied him one, and that the senior hearing officer told him he was "guilty of the '115' since you weren't eating." The Office of Appeals of the California Department of Corrections and Rehabilitation (CDCR) denied his appeal in a November 2013 written decision. It found that the senior hearing officer had acted within the scope of his authority by denying Gomez's request for an investigative employee and that Gomez "was provided appropriate due process." It concluded the finding of guilt was based "upon a preponderance of the evidence, . . . including the fact that [Gomez] refused nine or more consecutive meals to demonstrate his intent to participate in the planned demonstration."

## V.

### *Gomez's Habeas Petitions*

In January 2014, Gomez filed a habeas petition in Del Norte County Superior Court challenging the disciplinary ruling and asking for the restoration of his conduct credits. The court summarily denied Gomez's petition.

Gomez then filed a habeas petition in propria persona with this court. We ordered the PBSP Warden to show cause why the relief requested in the petition should not be granted and to focus in particular on Gomez's First Amendment freedom of speech claim, and further ordered that counsel be appointed for Gomez.

Subsequently, PBSP Acting Warden Clark E. Ducart (respondent) filed a return and a declaration from G.W. Olson, a captain of PBSP's SHU Facility "C" since 2012 and a long-time PBSP employee. Olson stated that the SHU "is used to segregate prison gang affiliates to disrupt gang communications and prevent gang activity," and "has

7

proven to be an effective tool for interdicting gang activity." He continued, "The 2013 mass inmate hunger strike was initiated by high-ranking prison gang leaders housed in Pelican Bay's SHU, who ordered all California prisoners . . . to simultaneously refuse food and refuse to work to disrupt CDCR operations throughout the state." It "was a coordinated effort by prison gangs to loosen prison restrictions so that more gang affiliates could be returned to the prison system's general population where they can more easily facilitate prison gang business, including but not limited to drug-dealing, extortion, and violence. Prison gang affiliates and other inmates were coerced into participating in the hunger strike and work stoppage under threat of violent retribution by the gangs."

Olson further stated that the "CDCR has routinely issued . . . 115s[] to inmates who participate in mass disturbances, including hunger strikes and work stoppages." In September 2011, the CDCR warned inmates that mass disruptions would result in disciplinary actions and encouraged them to utilize the administrative appeals process to air their grievances. "A mass hunger strike," Olson continued, "is disruptive to normal prison operations because the physical and mental health of inmates on a hunger strike must be monitored. Staff must spend a significant amount of time documenting wellness checks and inmate meal refusals. Staff resources must be diverted from routine assignments to oversee inmates on the hunger strike. Because a mass hunger strike imposes extra demands on staff, numerous prison programs, such as law library, canteen, yard time, and non-urgent health care appointments, must be temporarily canceled. As just two specific examples, the 2013 mass hunger strike caused significant delays in the delivery of annual packages to SHU inmates and their law library schedule and it took months of effort to catch up with the backlogs. Thus, a mass hunger strike affects all inmates, not just those who are participants."

Olson continued, "Although an individual inmate may not see disruption to his own program, when multiple inmates engage in a mass hunger strike like the one in 2013, the collateral consequences of their coordinated actions cause a ripple effect that is felt throughout the institution as staff resources are directed at managing those inmates. Even

8

though an inmate is refusing to eat, his meal is still prepared and (if he is in a SHU or administrative segregation) brought to him so that he has an opportunity to eat. If the inmate refuses his meal, staff document the refusal to eat. Staff must then interview the inmate to learn the reason for the hunger strike and to ensure that the inmate is voluntarily participating in the hunger strike and not being coerced by other inmates into refusing his meals. As part of their monitoring of inmates on hunger strike, custody staff search the inmate's cell and confiscate food items so that the inmate's caloric intake can be monitored and tracked. The inmate is also observed by staff to reduce the possibility that other inmates might sneak food to hunger-striking inmates, which would cause unreliable data about their caloric intake. In addition, medical staff have to monitor the health of the hunger-striking inmates, noting their weight, responsiveness, and appearance. This increased monitoring led to the cancelation [*sic*] of non-urgent medical appointments for all inmates, not just those participating in the strike."

Olson further stated: "Although the prison can accommodate individual hunger-striking inmates without a significant impact on its programming, as more inmates participate, the more prison programming is disrupted. Accordingly, Pelican Bay's Operational Procedures allow for up to nine individual hunger strikers before the strike is considered an organized mass disruption to the prison program. [¶] Pelican Bay's Operational Procedurals state that when an inmate(s) refuses nine or more consecutive state issued meals, they shall be identified as a participant of a hunger strike. During the 2013 mass hunger strike, over 1,400 inmates at Pelican Bay refused nine consecutive state-issued meals. [¶] An individual inmate may refuse food. But inmates may not organize a mass protest that disrupts prison programming. CDCR provides a prison grievance process that inmates may use to pursue their grievances. And, to the extent an inmate contends his conditions of confinement violate the law, he may bring legal action."

# DISCUSSION

## I.

### *Gomez Can Maintain His Petition.*

Respondent first argues that Gomez has not suffered a deprivation of "liberty" sufficient to raise due process concerns because his conduct credits can be restored upon his request. Therefore, we should deny his petition without addressing its merits. We disagree.

Prisoners in California have the statutory right to conduct credits. As a result, they have a vested liberty interest to conduct credits protected by the Due Process Clause of the United States Constitution. (*In re Johnson* (2009) 176 Cal.App.4th 290, 297 (*Johnson*); *In re Rothwell* (2008) 164 Cal.App.4th 160, 165.) They are entitled "to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." (*Wolff v. McDonnell* (1974) 418 U.S. 539, 557 (*Wolff*).) As we will discuss, among these minimum requirements is that conduct credits cannot be revoked "unless the findings of the prison disciplinary board are supported by some evidence in the record." (*Superintendant, Mass. Correctional Inst. v. Hill* (1985) 472 U.S. 445, 454 (*Hill*).)

Respondent claims that "[a]ll Gomez need do to restore his lost credits is submit a form to his correctional counselor." Therefore, respondent argues, Gomez has not really lost any credits, and cannot allege that he has suffered any deprivation of liberty that warrants due process scrutiny.

Respondent overstates Gomez's eligibility for restoration. Inmates whose credits have been revoked may apply for a credit-restoration hearing after completing a "disciplinary-free period,"[7] unless the inmate "has . . . refused or failed to perform in a work, training, or educational assignment during the required disciplinary-free period, or under extraordinary circumstances, as described in section 3329." (§ 3327, subds. (b), (c).) "Extraordinary circumstances" are "significant factors which aggravate the

---

[7] In Gomez's case, this period is 180 days. (§ 3328, subd. (b).)

10

seriousness of a rule violation." (§ 3329, subd. (a).) Thus, Gomez is entitled to a "consideration hearing," not to a full credit restoration. (§ 3327, subd. (b).) Respondent does not establish that Gomez is merely an application away from credit restoration.

Just as important, PBSP authorities have revoked Gomez's credits and he is entitled to judicial consideration of *that* decision. The *Wolff* court recognized that conduct credits, once revoked, could be restored in the future. It noted that revocation of conduct credits "can postpone the date of eligibility for parole and extend the maximum term to be served, *but it is not certain to do so, for good time may be restored*." (*Wolff*, *supra*, 418 U.S. at p. 561, italics added.) Nonetheless, the *Wolff* court held that revocation of a prisoner's conduct credits implicated the prisoner's liberty interest and due process rights. (*Id*. at p. 558.) Accordingly, we reject respondent's "lack of deprivation" argument, and turn now to the merits of Gomez's petition.

## II.

### *There Is Not Some Evidence That Gomez Violated Section 3005(a)*.

Gomez argues that we must grant his petition because the senior hearing officer's ruling was not supported by sufficient evidence, and respondent disagrees. We agree with Gomez.

### A. The "Some Evidence" Standard

We review the record to determine if "some evidence" supports the senior hearing officer's ruling. "Due process . . . requires only that there be 'some evidence' to support the findings made at the disciplinary hearing." (*Johnson*, *supra*, 176 Cal.App.4th at p. 299, citing *Hill*, *supra*, 472 U.S. at p. 457 and *In re Estrada* (1996) 47 Cal.App.4th 1688.) "Under this standard, prison disciplinary action will not be disturbed so long as 'some evidence' supports the action taken. [Citation.] 'Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any evidence in the record* that could support the conclusion reached by the disciplinary board.' " (*In re Zepeda* (2006) 141 Cal.App.4th 1493, 1498 (*Zepeda*), quoting *Hill*, *supra*, at pp. 455–456.)

11

"Implicit in the 'some evidence' standard of review is the recognition that due process requirements imposed by the federal Constitution do not authorize courts to reverse prison disciplinary actions simply because, in the reviewing court's view, there is a realistic possibility the prisoner being disciplined is not guilty of the charged infraction." (*Zepeda*, *supra,* 141 Cal.App.4th at p. 1498.)  " 'Revocation of good time credits is not comparable to a criminal conviction,' and 'neither the amount of evidence necessary to support such a conviction' nor 'any other standard greater than some evidence applies . . . .' (*Hill*, *supra*, 472 U.S. at p. 456.)  Thus, to withstand court scrutiny for federal due process purposes, there is simply no requirement that the evidence 'logically precludes any conclusion but the one reached by the disciplinary [official].' (*Id*. at p. 456.)  Rather, all that is required is ' "some evidence from which the conclusion of the [official] could be deduced." ' (*Id*. at p. 455; [citations].)" (*Id*. at p. 1499.)

Nonetheless, as our Supreme Court has remarked (regarding judicial review of parole decisions),[8] " 'the exceedingly deferential' " nature of the " 'some evidence' " standard " 'does not convert a court . . . into a potted plant.' " (*In re Lawrence* (2008) 44 Cal.4th 1181, 1212 (*Lawrence*), quoting *In re Scott* (2004) 119 Cal.App.4th 871, 898.) "[J]udicial review must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights. . . .  [A]n inmate's right to due process 'cannot exist in any practical sense without a remedy against its abrogation.' " (*Lawrence*, at p. 1211.) Thus, "the 'some evidence' " test . . . must have some rational basis in fact." (*In re Scott* (2005) 133 Cal.App.4th 573, 590, fn. 6.)

In short, "the court may inquire only whether some evidence in the record . . . supports the decision . . . based upon the factors specified by the statute and regulation." However, "[i]f the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant

---

[8]  The "some evidence" standard used by our courts to review parole decisions also has its roots in *Hill*, *supra*, 472 U.S. 445.  (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 656 (*Rosenkrantz*).)

the prisoner's petition for writ of habeas corpus." (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 658.)

## B. What a Violation of Section 3005(a) Requires

In order to determine whether there is "some evidence in the record" that "supports the decision . . . based upon the factors specified by the . . . regulation" (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 658), we must first determine what a violation of the regulation—in this case section 3005(a)—requires.[9]

Section 3005(a) states, "Inmates and parolees shall obey all laws, regulations, and local procedures, and refrain from behavior which might lead to violence or disorder, or otherwise endangers facility, outside community or another person." No one has contended that Gomez failed to obey a law, regulation or local procedure other than section 3005(a) itself, nor that he engaged in behavior that might lead to violence. Therefore, we focus on the phrase "behavior which might lead to . . . disorder, or otherwise endangers facility, outside community or another person."

"Generally, the rules that govern interpretation of statutes also govern interpretation of administrative regulations." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1097.) Thus, we begin our review of section 3005(a) "giving effect to its usual meaning and avoiding interpretations that render any language surplusage." (*Ibid*.) "It is a maxim of statutory interpretation that courts should give meaning to every word of a statute and should avoid constructions that would render any word or provision surplusage. [Citations.] 'An interpretation that renders statutory language a nullity is obviously to be avoided.' " (*Tuolumne Jobs & Small Business*

---

[9] Sergeant Navarro stated in his CDC 115 that Gomez's refusal to eat nine consecutive meals violated section 3005*(d)(3)*, which states that "[i]nmates shall not participate in a riot, rout, or unlawful assembly." However, the senior hearing officer found that Gomez (despite pleading "guilty" according to the hearing summary) was *not* guilty of violating this section. Instead, the senior hearing officer found Gomez had engaged in the "equally included offense" of violating section 3005(a). We have no idea what the senior hearing officer meant by the phrase "equally included offense" and we have not found the phrase used in any case in the LEXIS federal or state cases database. Regardless, we turn to an examination of section 3005(a) itself.

*Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038-1039; accord, *In re Espinoza* (2011) 192 Cal.App.4th 97, 104 [regarding regulations]; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [we "accord[] significance, if possible, to every word, phrase, and sentence"].)

Applying these interpretative rules here, we first note that, on the one hand, the plain meaning of section 3005(a) indicates that the behavior does not need to be one of disorder itself, but merely a behavior that "might lead" to disorder ("or otherwise endangers"). Nonetheless, the behavior cannot be of any kind. Rather, it must be behavior "which might lead to . . . *disorder.*" (§ 3005(a), italics added). "Disorder" generally means "a condition marked by lack of order, system, regularity, predictability, or dependability"; "the act or fact of disturbing, neglecting, or breaking away from a due order"; "a breach of public order"; "disturbance of the peace of society"; "misconduct, misdeed, misdemeanor"; "an instance of such disorder or misconduct." (Webster's Third New Internat. Dict. (2002 ed.), p. 652.)[10]

Further, the term "disorder" is immediately followed by the phrase "or otherwise endangers facility, outside community or another person." This phrase provides further insight into the term's intended meaning. It indicates the "disorder" contemplated by section 3005(a) is of a particular sort, that being disorder which "*endangers*" any one of three particular things: "*facility, outside community or another person.*" To conclude anything else would be to render the term "otherwise" to be surplusage, an interpretation that we must avoid. (*Berkeley Hillside Preservation v. City of Berkeley*, *supra*, 60 Cal.4th at p. 1097; *Tuolumne Jobs & Small Business Alliance v. Superior Court*, *supra*, 59 Cal.4th at pp. 1038–1039; *Dyna-Med, Inc. v. Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at pp. 1386–1387.) "Endanger" means "to bring into danger or peril of

---

[10] "Disorder" is also defined as "a derangement of function" and "abnormal physical or mental condition," neither of which apply to the present circumstances. (Webster's Third New Internat. Dict. (2002 ed.), p. 652.)

14

probable harm or loss"; to "imperil or threaten danger"; or "to create a dangerous situation." (Webster's Third New Internat. Dict. (2002 ed.), p. 748.)[11]

To summarize then, in order to determine the validity of the disciplinary ruling at issue here, we must determine whether there is "some evidence" that Gomez violated section 3005(a) specifically. In order to make this determination, we must find some evidence that he engaged in behavior that "might lead" to disorder, e.g., a breakdown in order, such that the "facility, outside community or another person" was brought into danger or peril of probable harm or loss. We turn now to this task.

### C. The Evidence Presented at the Disciplinary Hearing

The hearing summary itself states that no witnesses testified at the hearing and the only evidence presented was the CDC 114-A, the segregation record for Gomez that indicates he refused nine consecutive meals from July 8, 2013, to July 10, 2013.

In his findings, however, the senior hearing officer also referred to the "testimony" of Sergeant Navarro, which could only be a reference to Navarro's statements in the CDC 115. These statements, in addition to those recounting Navarro's discovery of Gomez's refusal of nine consecutive meals, were that OP 228 interprets such a refusal as a "hunger strike" and that Gomez's "refusal coincided with a planned, statewide hunger strike/work stoppage/mass disturbance organized by the inmates housed in the SHU at PBSP. GOMEZ's willful and deliberate behavior has caused delays in the custody operations and additional workload for custody and medical staff by the increase in escorts and the monitoring of inmates suspected of participating in this hunger strike. With these additional requirements, staff members have been delayed in the performance of their normal duties. Furthermore, GOMEZ's actions by willfully participating in the hunger strike, have contributed to significant disruptions of the normal operation of this Institution. The disruptions are noted by having delayed or canceled inmate services, such as the Law Library, canteen, medical appointments and yard. GOMEZ's refusal to

---

[11] "Endanger" is also defined as "to subject to another's power" and "to make liable to punishment or arrest," neither of which apply here. (Webster's Third New Internat. Dict. (2002 ed.), p. 748.)

use the appropriate venues to voice his grievance has resulted in a decrease in services for him and the inmates who have not participated in this hunger strike/work stoppage/mass disturbance."

From this "testimony," the CDC 114-A and Gomez's "guilty" plea, the senior hearing officer concluded that Gomez was guilty of a violation of section 3005(a) because he engaged in the "specific act" of "Delaying a P/O Participation in a Mass Hunger Strike."

**D. Analysis**

We conclude there was not some evidence that Gomez violated section 3005(a). Upon examination, none of the three items the senior hearing officer relied on to conclude Gomez had violated this particular regulation provide any evidence to support his conclusion.

The CDC 114-A merely established that Gomez refused nine consecutive meals from July 8, 2013, to July 10, 2013, and nothing more. This establishes the particular behavior for which Gomez was disciplined, but it adds nothing to an inquiry into what might result from this behavior other than its recording on the CDC 114-A. Certainly, this recording was not "disorder" that endangered the "facility, outside community or another person." Therefore, the CDC 114-A is not by itself some evidence in support of the ruling that Gomez violated section 3005(a).

Gomez's "guilty" plea also does not provide some evidence that he violated section 3005(a). This is because the record indicates that when the hearing commenced he had notice of only one charge against him: that, as contended by Sergeant Navarro in the CDC 115, because of his refusal of nine consecutive meals as part of the larger hunger strike/work stoppage, and the effect on prison operations that resulted, Gomez had violated section 3005(d)(3). However, despite Gomez's "guilty" plea, the senior hearing officer found that Gomez was *not* guilty of violating section 3005(d)(3). We can think of no reason why the senior hearing officer would reach this conclusion if Gomez were pleading guilty to the *legal* violation brought against him. The only logical conclusion that can be made from these circumstances is that Gomez admitted that he was "guilty"

16

of refusing nine consecutive meals and, for the sake of argument, we will assume that he also admitted to the other *factual* contentions by Sergeant Navarro in the CDC 115. There is nothing in the record to indicate that Gomez pled guilty to the charge that he violated section 3005(a).

This leaves us with Sergeant Navarro's factual assertions and the conclusions drawn from them by the senior hearing officer.[12] We conclude these statements were not some evidence that Gomez violated section 3005(a) either. As we have discussed, in order for Gomez to violate that provision, he must have engaged in behavior that "might lead" to "disorder" that "endangers facility, outside community or another person." Navarro's contentions did not rise to that level. Instead, Navarro asserted that as a result of Gomez's refusal to eat nine consecutive meals as part of a larger hunger strike, Gomez (1) contributed to a delay of staff members in the performance of their "normal duties" because of the "additional workload for custody and medical staff by the increase in escorts and the monitoring of inmates suspected of participating in this hunger strike," and (2) contributed to "significant disruptions" in the "normal operation of this Institution," which "delayed or canceled inmate services, such as the Law Library, canteen, medical appointments and yard," including for inmates who "have not participated in this hunger strike/work stoppage/mass disturbance." None of these contentions indicate that the facility, outside community or another person was endangered, i.e., put in danger or peril of harm or loss, nor do they indicate that there was a breakdown of order in any aspect of the prison; to the contrary, it is apparent from Navarro's statements that PBSP authorities were acting within their discretion to make

---

[12] As we have discussed, respondent has also submitted a declaration by G.W. Olson, a captain of PBSP's SHU Facility "C", in which Olson made various statements about the 2013 hunger strike in which Gomez participated and its effect on prison operations. We disregard his declaration in its entirety because the record indicates it was not before the senior hearing officer when he determined that Gomez violated section 3005(a) and, therefore, was not considered by him in reaching his ruling. (See *Rosenkrantz*, *supra*, 29 Cal.4th at p. 658 [noting that "the court may inquire only whether *some evidence in the record before the Board* supports the decision to deny parole, based upon the factors specified by statute and regulation," italics added].)

17

adjustments to workloads and services in order to contend with the hunger strike and work stoppage, and his statements do not indicate that the protest involved any violence or disorderly conduct. Indeed, even assuming for the sake of argument that the disorder prohibited by section 3005(a) did not have to rise to the level of endangering "facility, outside community or another person," nothing in Navarro's account of the delays and cancellation of services, and the reallocation of prison personnel, such as to monitor the hunger strikers,[13] suggests prison operations were thrown into disorder.

In light of our conclusions, we have no need to, and do not, address Gomez's arguments that his refusal of meals was a constitutionally protected exercise of his right to freedom of speech, or that the decision to deny him an investigative employee violated his due process rights.

## DISPOSITION

Gomez's petition is granted. Respondent is ordered to reverse the disciplinary ruling that Gomez violated section 3005(a), thereby committing a serious rules violation, restore Gomez's 90 days of conduct credits and expunge all references to his disciplinary charge from his central file.

---

[13] Navarro's references to the effects of the protest on prison operations do not differentiate between what might have been caused by the hunger strike as opposed to the work stoppage. There is no evidence in the record that Gomez supported the work stoppage.

18

_____
STEWART, J.

We concur.


_____
KLINE, P.J.


_____
RICHMAN, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JORGE A. GOMEZ,<br><br>      on Habeas Corpus. | A142470<br><br>(Del Norte County<br>Super. Ct. No. 145020) |

BY THE COURT:

      The opinion in the above-entitled matter filed on March 25, 2016, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____        _____

                                             Kline, P.J.

Trial Court:  Del Norte

Trial Judge:  Leonard J. LaCasse


Attorney for Petitioner:  Jorge A. Gomez
                          In pro. Per
              Jonathan Soglin and L. Richard Braucher, under appointments by the Court
              of Appeal


Attorneys for Respondent:  Kamala D. Harris
                           Attorney General
                           Jennifer A. Neill
                           Senior Assistant Attorney General
                           Sara J. Romano
                           Supervising Deputy Attorney General
                           Amber N. Wipfler
                           Deputy Attorney General
                           Pamela B. Hooley
                           Deputy Attorney General